CITY OF MACON et al., Defendant in Error, v. FIDELITY & DEPOSIT COMPANY, Plaintiff in Error.

Kansas City Court of Appeals, November 6, 1916.

1.  LOST INSTRUMENT: Admissibility of Secondary Evidence.    In an action on the bond of a city contractor, proof of loss was made by testimony of the city clerk that a search of the records in his office did not show the bond.    The mayor who had approved the bond and whose term had expired before trial also testified to searching for the bond in the office of the clerk, and to seeking it in the offices of the attorneys for the contractor, and of one who made loans to the contractor.    The agent of the surety, the loss having been discovered long before suit, had informed the municipality that he had no copy of the bond, but stated that the bond was of the ordinary form guaranteeing the payment of labor and material for the public work.    *Held* that, though the one who was the incumbent when the bond was approved was not called, and though the clerk who testified admitted that he did not look in a vault where old records were kept proof of the loss of the bond, there being no suspicious circumstances against the municipality or materialmen, was such that the discretion of the trial court in receiving secondary evidence cannot be disturbed; the surety, notwithstanding the admission of its agent, claiming on trial that the bond did not cover payment of labor and material.

2.  DEGREE OF SEARCH AND STRICTNESS OF PROOF REQUIRED: Discretion of Trial Judge.    Where a cause of action

is predicated upon the contents of an alleged lost instrument, greater diligence in search and more strictness in proof is required than where the lost instrument is merely collateral to the main issue of the case. Whether the proof of the loss of an instrument is sufficient to warrant the admission of secondary evidence is a matter for the discretion of the trial judge, and his determination, unless abused, will not be disturbed. Secondary evidence of a document of a public nature, for which a particular place of deposit is provided, may be received, where an unsuccessful search in such place is shown. The degree of diligence to be shown to warrant the admission of secondary evidence cannot be determined by any inflexible rule; less diligence being required where there are no circumstances of suspicion against the parties seeking to introduce secondary evidence, and where such parties did not have possession of the instrument.

3. MUNICIPAL CORPORATIONS: Contracts: Bonds: Evidence: Admissibility. In an action on the lost bond of a municipal contractor, evidence that it was given under an ordinance requiring the bond to cover payment of labor and materials is admissible to show that the bond included such claims; for it will be presumed that the parties gave such bond as was required.

4. ————: Instructions. In an action on the lost bond of a municipal contractor, where the surety's general agent had written a letter stating that it covered payment for labor and material, an instruction that the letter did not bind the company so as to render it liable for payment of labor and material is misleading as to the effect to be given the admission by the agent.

Error to Buchanan Circuit Court.—*Hon. C. H. Mayer, Judge.*

AFFIRMED.

*William E. Stringfellow* for plaintiff in error.

*Culver & Phillip* for defendant in error.

TRIMBLE, J.—The city of Macon, in January, 1912, by Ordinance No. 558, authorized the construction of a public sewer and directed that bids should be received and a contract let for the work in accordance with the terms of said ordinance. Pursuant to section 1247, Revised Statutes 1909, making it the duty of the city to require a bond of the contractor conditioned for

the payment for all materials used in and labor performed upon the work, section 10 of said ordinance required the contractor, at the time of entering into the contract, to execute and deliver to the city a bond in double the amount bid for the work with at least one good surety, to be approved by the mayor, conditioned for the faithful performance of the work and the payment for all materials and labor furnished for the same.

Thereafter the contract was duly awarded to the Kelly Construction Company, and as such contractors they gave a bond to the city with the plaintiff in error herein (which for convenience and tò avoid confusion we will call the defendant), as surety. The Evans & Howard Fire Brick Company, furnished said contractors materials used in the construction of said sewer amounting to the sum of $1020.62 for which said contractors failed to pay. Thereupon, suit was brought on said bond to recover the amount due for the materials so furnished. Judgment was rendered against the surety for the full amount asked, with interest. The surety appealed, but afterwards dismissed its appeal and sued out a writ of error.

The bond on which the suit was brought was lost and its loss was alleged in the petition. It was the contention of the plaintiff below that the bond was specifically conditioned that the contractors should *pay for all labor and material* used in the work: While defendant below contended that the bond was conditioned that the contractors should *do all the work* required by the contract. It was conceded that the contractors owed the Fire Brick Company the amount sued for and that the materials for which the amount was due went into the construction of the sewer. There was also no question over the fact that bond was actually given by defendant, the surety company, to the city in connection with the contract awarded to the contractors. The contest was over the question as to whether the bond covered mere performance of the work or whether it also included payment for labor and material.

After evidence had been introduced touching the loss of the bond and of the search for and failure to find it, the court, over the objection of defendant, permitted plaintiff to introduce oral testimony concerning the bond and its contents. This oral evidence amply tended to show that the bond of the defendant surety company, which the city approved and accepted, covered not only the work to be done but also payment for labor and materials. Mr. T. F. Matthews, a lawyer, who was Mayor of the city at the time the bond was given, and whose duty it was to approve the bond, testified that a bond, signed by defendant as surety, was first presented to him for approval, which he examined as counsel for himself, and which he found specifically covered only performance of the work, and that for this reason he refused to approve the bond, and thereupon another bond of the same company was presented which contained an express provision as to payment for labor and materials, the absence of which from the first bond had caused him to reject it. He further testified that only one bond was ordered filed by the council; that the first bond presented to him, and which he did not approve, was not filed. There was also certain other evidence, hereinafter adverted to, tending to show that the bond which was accepted covered payment for labor and materials. So, that, if sufficient grounds were laid for the admission of oral evidence as to the bond and its contents, there is no question but that such oral evidence amply tended to support plaintiff's allegation that the bond, which was accepted and approved, specifically covered payment for labor and materials. The defendant contended, however, that only one bond was made, and, in presenting its side, offered in evidence what purported to be a carbon copy of that bond which, after reciting the contract for the construction of the sewer authorized and required under ordinance No. 558, was conditioned that if the contractors "shall well and truly do and perform all the work required of them by said contract, then this obligation to be void." The question, therefore, for our determination is whether

or not plaintiff introduced sufficient evidence, as to the loss and consequent inability to produce the bond sued on, to justify the admission of oral evidence as to its contents. Of course there must be evidence of a proper search for an instrument that is claimed to be lost, but, that is for the purpose of proving that it is really lost and cannot be produced.

The evidence of the loss and search for the bond is, in substance as follows: Matthews testified that as Mayor he presided over the council that awarded the contract; that, after he approved the second bond presented to him, it was ordered filed by the council and was then handed by him to the city clerk and filed and deposited by the clerk in the city records. This was some time between January 15, 1912, the date of the ordinance authorizing the work, and April, 1912, the date of the expiration of his term as Mayor. Bryan Hurst was city clerk at that time and his term also expired April, 1912. Some time in the fall of that year and before the work on the sewer was completed, but before the controversy involved in this suit arose, Matthews, having occasion to look at the bond, ascertained from the city officials that it was lost. He made a search for it himself through the city records and through the files in the city offices and also in the law office of Guthrie & Franklin, attorneys for the contractors, the last named search being participated in by the firm and its stenographer. He also made inquiry and had search made through the records of the Rubey Trust Company which had lent the contractors some money and, as security, had taken an assignment of the sewer taxbills to be issued by the city to the contractor. (We assume that the reason search was made in the last two mentioned places was because it was thought that perhaps these parties, being interested in the work of the contractor and his bond, might have obtained it from the city records and might have it in their possession.) Mr. Matthews also testified that he made another search, as before, for the bond about five days before the trial,

which was in October, 1914, but that in all of these searches he was unable to find it.

J. L. Martin, who became city clerk in April, 1912, and who has been city clerk ever since, was next called and he testified that shortly after he was elected clerk and as soon as it was discovered that the bond was missing, he took a good look for it everywhere in his office, but failed to find it; that he had made search for it a number of times and took another "good strong look" the day before the trial; that in his search he had looked through the papers in his office, inquired of the clerk who preceded him, had asked attorneys interested and had gone to the Rubey Trust Company and asked them if it was there, but all to no avail. He further testified that such bonds were kept in his, the city clerk's, office; that other bonds, such as official bonds and one other contractor's bond, were there in his office; that there was no safe, where the city kept or keeps such bonds as this, other than the safe in his office; and that he knew of no other place he had not searched where he could look with any reasonable expectation of finding it. On cross-examination he testified that the city clerk's office was adjoining the city council room upstairs in the city hall; that in the clerk's office is the large iron safe, a desk and cases where papers were kept; that not all the papers were kept in the safe, a great many papers, accounts and books and perhaps a dozen letter files were kept in the office, but papers of the character of a contract or bond, or things of that sort, individual separate papers, were ordinarily put in the safe. He testified that he searched through all the papers in his office. On further cross-examination he testified that downstairs there was a vault "where the old records, when they are way old, are kept, and old ordinances;" that the main things in the vault downstairs "are the ordinances, pigeon holes with ordinances stowed away; over five hundred ordinances have been issued and they are taken down and placed there, a filing place for ordinances after they are disposed of."

The foregoing is all the testimony plaintiff offered in chief concerning the loss of, search for and inability to find and produce the bond sued on. But, during the further trial of the case, additional evidence was adduced in support of plaintiff's contention that the bond explicitly covered the payment for materials. As stated, there was no dispute but that the defendant had given a bond which had been approved by the Mayor and accepted by the city. The only question was as to the *conditions* of the bond.

In support of defendant's contention that the bond covered only work and not payment for materials, defendant introduced its general agent who executed the bond for the company. He produced the carbon copy hereinbefore referred to, which was *typewritten* throughout, and swore that it was a copy of the bond he executed. He also swore that the bond was dictated to a stenographer by him, although he admitted that in his deposition, taken previously to the trial, he had testified he had printed forms which covered material and labor. He further admitted on cross-examination that he read the ordinance and knew it required a bond which would cover labor and material but that he wrote the bond to cover performance of the work only; that they didn't write bonds so as to cover material unless compelled to; and that he thought he could escape putting that provision in the bond.

He further testified positively that from the day the bond was prepared he had *kept the carbon copy in the safe in his office,* that it had never been out of his possession and that he had always known the bond did not cover payment for labor and materials. Thereupon he was confronted with a letter, upon his stationery and bearing his fac simile signature affixed by means of a stamp he had for that purpose, which was received through the mail by the Mayor of Macon in reply to a letter written to him by the Mayor asking for a copy of the bond. This letter from the agent's office was dated January 20, 1913, and, among other things, said: "Replying to yours of the 16th, will say that *I do not*

*have a copy of the bond in my office at the present time
. . . Our bond was one of the standard forms* of
bonds, *guaranteeing the payment of labor and material
on the sewer."* Before he was confronted with the let-
ter, and after he had testified that he had known all
along that the bond didn't cover labor and material, he
was asked if he would tell anybody the bond did cover
labor and material if it didn't, and his reply was that he
might.   He further admitted that he might tell an
untruth if it was necessary and when it was not de-
sirable to tell the truth, and that that occurs occasionally,
once in a while.   After being confronted with the letter
he was asked if this was one of the cases in which he
thought he was justified in "yarning" about it and he
replied, "I think so, yes."   He was also asked if there
were not a number of letters written to him after the
bond was lost, asking him to produce a copy and he
had answered and said he had no copy.   His reply was,
"I may have."

In the above mentioned letter to the Mayor it was
stated that, in case the original bond was not located, "I
shall be glad to secure a copy for you."   Afterwards,
in view of that promise, the city clerk in May, 1913,
wrote the general agent that he had looked everywhere
and inquired of every one who could have knowledge of
it and had been unable to find it, and requested him
to furnish a copy.   Again in February, 1914, the city
clerk wrote telling him the bond had not been found
and requested a copy.   Neither of these letters were
answered.

It will be seen, therefore, that, in addition to plain-
tiff's oral evidence as to the bond covering payment
for material and labor, there was the admission con-
tained in the letter of defendant's general agent that
it did so.   In other words, there were no circumstances
of suspicion as to the actual loss of the original bond,
or as to the bona fides of the city officials' search for
it, or as  to their inability to find it and plaintiff's con-
sequent inability to produce it.   In fact the only sus-

picious circumstances in the whole matter are those which attached to the opposite party's agent.

But defendant contends that because Bryan Hurst, who was city clerk at the time the bond was filed, was not called to testify, and because it was not shown that search was made in the down-stairs vault where the old ordinances were kept, the plaintiff did not show sufficient diligence and strict enough search to establish the loss of the bond so as to justify the admission of secondary evidence of its contents.

It is true that where, as in this case, the cause of action is predicted upon the contents of an instrument claimed to be lost, greater diligence in search and much more strictness in proof are required than in cases where the lost instrument is merely collateral to the main issue. [17 Cyc. 552.] The extent of the search required is also increased by the character and importance of the document, its value to parties other than the one to whom it is executed and the likelihood of their having it in their possession. *Ibidem.*

But proof of the loss is addressed to the discretion of the trial court, and if it is such as to reasonably satisfy the mind of the trial judge, that is sufficient. Of course that discretion must be a judicial one, governed by certain well defined rules, but unless it has been abused, appellate courts will not interfere. [Henry v. Diviney, 101 Mo. 378, 384; McConney v. Wallace, 22 Mo. App. 377, 381; Liles v. Liles, 183 Mo. 326, 336.] In a late work, 10 R. C. L., sec. 76, page 918, it is said: "The proponent (of a lost instrument) must show that he has in good faith exhausted, in a reasonable degree, all sources of information and means of discovery which the nature of the case would naturally suggest, and which were accessible to him. If any suspicion hangs over a lost instrument, or that it is designedly withheld, a rigid inquiry should be made into the reasons of its non-production. But where there is no such suspicion, all that ought to be required is reasonable diligence to obtain the original. The loss of it must be made out to the satisfaction of the court. The law exacts nothing

unreasonable in such a case. If parol proof of the loss establishes the fact with reasonable certainty, that is sufficient. The degree of diligence required in any case, in an effort to produce an original document alleged to be lost or destroyed, in order that secondary evidence of this contents may be admissible, depends upon the character and importance of the document, the purpose for which it is expected to be used, and the place where a paper of that kind might naturally be supposed to be found." And in section 77, p. 919, of the same work it is said that "to justify admission of secondary evidence of a deed, it is not necessary to prove its loss beyond all possibility of mistake. A reasonable probability of its loss is sufficient; and this may be shown by a bona-fide and diligent search, fruitlessly made for it in places where it is likely to be found."

The bond in this case was a part of the public records of the city and, as such, the law provided for it a particular place of deposit, i. e. the city clerk's office. The general rule as to search for documents of a public nature is thus stated in 25 Am. & Eng. Ency. of Law (2 Ed.), 167: "If the paper is a record for which a particular place of deposit is provided, it is sufficient if it is shown that search was made in this place unsuccessfully." "As a general rule it is enough that search has been made in the proper place and with the proper officer, for a paper, the custody of which is committed by law to a particular person, and that the paper cannot be found." [Braintree v. Battles, 6 Vt. 394, 395.] In Johnson v. Arnwine, 42 N. J. L. 451, the court, after quoting certain authorities announcing the rule, says on page 456: "If the paper be one of a kind that, in the usual course of business, would have a proper place of deposit, search in that place is all that will be required, and, in the absence of grounds of suspicion that the original has been fraudulently withheld, will justify the admission of secondary evidence, without calling persons who have had access to the paper, and possibly might have the original in their possession. [1 Taylor on Evidence, sec. 401.]" In Mandeville v. Reynolds, 68 N. Y.

528, the cause of action was upon a lost document which was of a public nature and required by a law to be kept in the clerk's office. At page 533 the opinion says: "This was a paper which it was the duty of the county clerk to have and to keep on deposit, in his official possession, at his public office. In such case if the paper is not found in the particular place provided for the deposit of it, the presumption is that it is lost or destroyed" citing Rex v. Stourbridge, 8 B. & C. 96. [See, also, Douglas v. Wolf, 6 Kan. 88; McKesson v. Smart, 13 S. E. 96.]

But it is urged that Hurst, the *former* city clerk, was not produced as a witness, although he could have been, and that for this reason the loss of the bond was not sufficiently established. It was Hurst's official duty to turn over to his successor Martin all documents and records of the city in his office and he is presumed to have done his duty. He was not custodian of the bond as an individual but as an official. The case of Johnson v. Arnwine, supra, was a suit for malicious prosecution. Plaintiff's proof that defendant instigated the prosecution depends upon the contents of a lost complaint and warrant. In the proof showing the loss of the originals, so as to permit the admission of secondary evidence, it was shown that the last seen of the complaint it was in the grand jury room before the grand jury. The defendant objected to the proof claiming that proof of search by the officer who was the legal custodian of the documents was not enough but the grand jury room should have been searched and the foreman and clerk of the grand jury, if not others of that body, should have been called. But the court, after quoting many authorities, held that where the document is one of public concern and there is by law a place where such instruments, in due course of law should be deposited and found, the place of deposit is the place for the search. The court approvingly cited cases upholding the doctrine that failure to call a particular officer could be excused on the presumption that he had done his duty, and held that in cases where the custody of a

paper is committed by law to a particular officer, as such, search in his office and among his official papers, will generally be sufficient, and that even though the lost papers were last seen in the hands of the grand jury, yet, as the clerk's office was the proper place for their deposit after the grand jury was through with them and it was the duty of the prosecuting attorney to return them there, plaintiff was not chargeable with the duty to search for them elsewhere.

In Freman v. Arkell, 2 B. & C. 494, 107 Eng. Rep. 467, one of the cases cited by the court in the Arnwine case, the lost papers were shown to have been delivered either to the clerk or his deputy. The clerk was produced and testified that he had searched for but failed to find them. It was held not necessary to call the deputy inasmuch as it was his duty, if he had received the papers, to turn them over to his principal.

In Minshall v. Lloyd, 2 Mees. & Wels. 450, 150 Eng. Exch. Rep. 834, the lost instruments, proof of the contents of which was necessary to establish plaintiff's case, consisted of a complaint and warrant. It was shown to have been the custom of the sheriff to turn his warrants over to an auctioneer to be sent to the Excise-office through the Supervisor of excise for that district. Search was made in the Excise-office, through the sheriff's papers and the auctioneer's, but the Supervisor was not called nor was any search made in his papers. It was held that reasonabl proof had been given of the loss of the papers so as to let in secondary evidence of their contents.

In short, the authorities are to the effect that the degree of diligence in search cannot be determined by any inflexible rule, but largely by the circumstances of each case. [17 Cyc. 548.] If the circumstances are such as to excite a suspicion that it is designedly withheld, a most rigid inquiry should be made, but if there is no such supicion, all that ought to be required is reasonable diligence and good faith in the effort to obtain the original. [17 Cyc. 550.] Where it appears from the preliminary evidence that there is no reasonable

probability or suspicion that the writing is designedly withheld or suppressed, sufficient grounds for the introduction of secondary evidence are established. In such case it is not necessary to negative every possibility of its suppression. And where the party, in whose interest secondary evidence is sought to be introduced, never had the custody of the instrument and never was entitled to its possession, the requirements will not be as strict as if it were one of which he had had possession or was entitled to the custody. [17 Cyc. 551.] As stated, so far as concerns either the city or the Brick company, there were no suspicious circumstances affecting them. The loss occurred long before any controversy over *payment for material or labor arose.* Martin, the city clerk, made repeated searches for the bond in his office and inquired of the former clerk and had searches made at every other place where there was any reason to suppose the bond might be found. Matthews, the ex-mayor, did the same. And the succeeding Mayor made efforts to obtain a copy of the bond from defendant which were ignored.

So far as concerns the failure to look in the vault of old ordinances down-stairs, we do not think this robbed the trial court of its discretion to find the proof satisfactory. The vault was not used as a depository of live and current papers, nor of such documents as bonds. There was no evidence of any chance, much less any reasonable likelihood, of the bond being there.

We are of the opinion that under the circumstances of the case the trial court was clearly justified in holding that loss of the bond and inability to produce it at the trial was established so as to permit secondary evidence of its contents. At any rate we cannot say the proof thereof was so insufficient, or that links in the evidence were so wanting, as to justify us in interfering with that holding.

Error is further claimed in that the court should not have permitted the introduction of Ordinance No. 558 in evidence, section 10 of which required a bond covering payment for material as well as work. We

cannot see how its introduction could prejudice defendant in view of the fact that defendant admitted in the course of the trial that the ordinance required that the bond should cover materials. As the law and the ordinance required that the bond should cover payment for materials, the presumption is that the parties were intending such a bond as the law required. [Lowe v. City of Guthrie, 44 Pac. 198.] The kind of a bond that was required was, therefore, a circumstance to be considered by the jury in determining what bond was given. [Judge of Probate v. Ordway, 23 N. H. 198.]

Defendant's instruction C was properly refused because it assumed a fact which was in dispute.

Instruction D was also properly refused. In substance, it told the jury that the statement, in the letter of defendant's general agent, that the bond covered payment for labor and material, did not bind the company or obligate it to pay for labor and material. Aside from whether this was a singling out and a commenting upon a specific portion of the evidence, the effect of the instruction would be to mislead the jury as to the attention to be given to the statement in the letter as *an admission,* if they believed the statement was true.

Finding no error in the record, the judgment cannot be disturbed but must be affirmed. It is so ordered. The other judges concur.